C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
DELANO HUBERT,                                    :
                                                  :   **MEMORANDUM DECISION AND**
                                                  :   **ORDER**
                                  Petitioner,      :
                                                  :   22-cv-4565 (BMC)
                    - against -                    :
                                                  :
                                                  :
SUPERINTENDENT MARK MILLER,      :
                                                  :
                                                  :
                                  Respondent.      :
                                                  :
-------------------------------------------------------- X

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 from his conviction

before a jury for second degree murder and second degree criminal possession of a weapon.  The

facts will be set forth below as necessary to address each of petitioner's ten points of error, but to

summarize, petitioner, after following the victim, Cesar Sanchez, on a bicycle, confronted him at

a housing project where Sanchez lived.  When Sanchez didn't back down, petitioner got off the

bicycle and shot Sanchez in the head, killing him.  The jury rejected petitioner's claim of self-

defense.

In the instant habeas corpus proceeding, most of petitioner's points of error are state law

issues which are not subject to review on federal habeas corpus.  None of them fall within the

narrow standard for review under the Antiterrorism and Effective Death Penalty Act.  The

petition is therefore denied.[1]

---

[1] In a letter filed shortly before the issuance of this decision, petitioner inquired as to when respondent would file an
opposition to the petition.  Under Federal Rule of Habeas Corpus Procedure 5(a), "the respondent is not required to
answer the petition unless the Court so orders."  This Court's initial scheduling order directed respondent not to

I.      **Resubmission of the Indictment**

This argument arises from the fact that the District Attorney had to re-present the case to a grand jury twice due to technical defects.  The first defect was that when the District Attorney initially presented the case, he did not introduce proof that Sanchez had died (just that he had been shot).  The trial court therefore reduced the murder charge to attempted murder with leave to re-present to the grand jury.  The District Attorney did that and again obtained an indictment on the same charges.  Then, the District Attorney realized that he had not instructed the grand jury that there is a "home-or-place-of-business" exception to second degree criminal possession of a weapon under New York law.  He advised the trial court that he was going back to the grand jury for another re-presentment to include that instruction, and the court did not object.  He re-presented the case again and again obtained an indictment for the same charges.

Petitioner raises two alleged problems with the re-presentation process.  First, under N.Y. C.P.L. § 210.20(6)(b), a re-presentation must occur within 30 days.  The District Attorney began re-presenting the case to the grand jury within the 30-day period, but because petitioner delayed his determination of whether he wanted to testify before the grand jury, the prosecutor did not complete the re-presentation until 9 days after the 30-day period had run.  Second, under N.Y. C.P.L. § 190.75(3), if the court dismisses an indictment as defective, the District Attorney may not again resubmit the case without a court order.  Here, the District Attorney re-presented the case a second time by merely advising the court that he was going to do so, rather than having the court enter an order authorizing him to do so.

answer the petition unless the Court directed it.  Having reviewed the state court record and the petition, there is no need for respondent to answer it.

The Appellate Division rejected both of these arguments on the merits: "Contrary to the defendant's contention, the People's resubmission of the case to the grand jury on February 3, 2015, was timely.  Moreover, the People were not required to seek leave of court before resubmitting the case to the grand jury on October 3, 2016."  People v. Hubert, 194 A.D.3d 959, 960, 147 N.Y.S.3d 137 (citation omitted), leave to appeal denied, 37 N.Y.3d 992, 152 N.Y.S.3d 409 (2021).

There are three reasons why this claim is insufficient to warrant habeas corpus relief.

First, federal habeas corpus is not available to address alleged deficiencies in following state statutes.  Federal courts review only questions of federal law, not state law.  Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").  In this case, the Appellate Division construed the New York state statutes to permit re-presentation when the prosecution begins its re-presentment within the 30-day period, even if it does not complete the re-presentation within that period, and without a second grant of leave from the court when the underlying indictment has not been dismissed, the court has already granted leave, and the two indictments are consolidated (which is what happened here).  It is not for this Court to tell the New York appellate courts that they are misconstruing New York statutes.

Second, petitioner's represented brief in the Appellate Division cited, as part of a string cite, "U.S. Const., Amends. V, XIV."  This is *de rigueur* for the state public defender (which appeared for petitioner on his counseled brief).  However, petitioner made no argument as to how the trial court's construction of the statutes violated due process, nor can this Court conceive of one.  It was presented strictly as an issue of statutory construction.

But even assuming there was a federal due process issue for this Court to review rather than just a state law issue, petitioner does not come close to satisfying the standard for habeas corpus relief.  AEDPA permits relief only if a state court's legal conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner."  Brown v. Payton, 544 U.S. 133, 141 (2005).

The Supreme Court has made clear that the AEDPA standard of review is extremely narrow and is intended only as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Ryan v. Gonzales, 568 U.S. 57, 75 (2013) (citation and internal quotation marks omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Since Harrington, the Supreme Court has repeatedly admonished lower courts for not affording sufficient deference to state court determinations of constitutional issues.  See, e.g., White v. Wheeler, 577 U.S. 73, 76-77 (2015) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a

4

formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013))).

There is no Supreme Court case holding or even suggesting that a state-required period of 30 days for re-presentation means that the prosecution must complete, rather than initiate, re-presentation within that period, as a matter of federal constitutional law. Nor is there any Supreme Court case addressing the issue of whether a prosecutor must obtain leave of court when re-presenting the case after he has already advised the court that he was going to do so. Thus, the Appellate Division's ruling is neither contrary to, nor an unreasonable application of, any Supreme Court authority.

Third, errors in the presentation of the case before a grand jury are harmless as a matter of law when the jury convicts a defendant under the indictment. As the Second Circuit has held, habeas corpus review of such errors is not available because "any error in the grand jury proceeding" was rendered "harmless beyond reasonable doubt" by the petit jury's guilty verdict. <u>Lopez v. Riley</u>, 865 F.2d 30, 32 (2d Cir. 1989) (quoting <u>U.S. v. Mechanik</u>, 475 U.S. 66, 70 (1986)); <u>accord</u> <u>Davis v. Mantello</u>, 42 F. App'x 488, 490 (2d Cir. 2002).

## II. Insufficiency of Evidence

Under New York law, to prove second degree murder, the prosecutor must disprove the defense of "justification" beyond a reasonable doubt. <u>See</u> N.Y. Penal L. § 25; <u>People v. Umali</u>, 10 N.Y.3d 417, 421, 859 N.Y.S.2d 104, 106 (2008). On direct appeal, petitioner contended that the District Attorney had not met this burden or, alternatively, the jury's verdict was against the weight of the evidence.

Petitioner referred to the following evidence: (1) petitioner testified that Sanchez had threatened to "blast" him, pulled out a gun, and fired at petitioner; (2) multiple witnesses heard

between two and four shots, but petitioner's gun only fired one shot; (3) two shell casings were removed from the scene, one of which had not been discharged from petitioner's gun; (4) there were inconsistencies between the sole eye witness's testimony and other evidence; (5) none of the other witnesses who arrived at the scene after they heard the shots could say who fired first; (6) circumstantial evidence suggested that a friend of Sanchez's (Lewis), who had a criminal record, might have removed Sanchez's gun when he came to the scene soon after Sanchez was shot; and (7) another witness who heard a single shot was not credible because of his criminal history.

In response, the District Attorney pointed to the following evidence: (1) two witnesses testified that petitioner shot Sanchez, and Sanchez did not display, threaten to use, or even possess a gun; (2) consistent with the autopsy report, the entry of the bullet through the left side of Sanchez's head and out the right side of his head showed that Sanchez was not even looking at petitioner when he was shot; (3) other witnesses testified that Sanchez's only significant gesture was to put a plastic bag on the ground; (4) there was direct evidence that petitioner had pointed and then fired his gun at Sanchez; (5) video footage confirmed that Sanchez was carrying a plastic bag; (6) petitioner's DNA was recovered from a hoodie matching numerous witnesses' description; (7) petitioner's statements to the police corroborated significant details of the civilian witnesses' testimony, including his acknowledgement that he had fired two shots; and (8) a police witness explained that shots often cause an echo which can be misinterpreted as multiple shots.

The Appellate Division rejected petitioner's argument, holding that "[v]iewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to disprove the defendant's justification defense beyond a reasonable doubt", and that "the jury's

rejection of the defendant's justification defense and the verdict of guilt were not against the weight of the evidence." Hubert, 194 A.D.3d at 960 (internal citations omitted).  The Appellate Division's decision survives habeas corpus review.

A petitioner seeking habeas corpus relief based on insufficiency of the evidence bears a doubly difficult burden.  First, the standard for reviewing claims of legal insufficiency is extremely narrow: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Thus, even when "faced with a record of historical facts that supports conflicting inferences," the court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Relief on a sufficiency claim cannot be granted unless the record is "so totally devoid of evidentiary support that a due process issue is raised." Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (internal quotation marks omitted).

But that is not all.  Under AEDPA, as noted above, a petitioner must be able to show that the state court decision was "contrary to, or an unreasonable application of," Supreme Court precedent.  28 U.S.C. § 2254(d).  It is not enough for a petitioner to say that the Due Process Clause requires sufficient evidence of guilt (or, as in this case, sufficient proof of no justification), and that, when the habeas corpus court reviews the state court record and balances the evidence, it is insufficient; rather, he must show, at the very least, that there is an analogous Supreme Court case to which the state court failed to give appropriate deference.  Here, neither the petition before this Court, nor petitioner's represented Appellate Division brief, made any such argument.  Although petitioner's brief cited Jackson and In re Winship, 397 U.S. 358, 364

(1970), neither of those cases do anything more for him than confirm that evidence must be sufficient to prove a defendant's guilt beyond a reasonable doubt.

*De novo* review instead of AEDPA review would not lead to a different outcome. Although there was contradictory evidence, there was abundant evidence for the jury to parse through and determine factual disputes.  In no way could the jury be called "irrational" for determining to accept the prosecution's view of the facts rather than that of petitioner, as required under <u>Jackson</u> and its progeny.

In fact, petitioner's argument on legal insufficiency sounds much more like his alternative argument that the verdict was against the weight of the evidence.  He simply argues the conflicting evidence and asserts that the Appellate Division should have seen it his way.  But weight of the evidence arguments are not cognizable on federal habeas corpus review.  <u>See</u> <u>Correa v. Duncan</u>, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

## III.    Trial Court's Limitation of *Voir Dire*

As is the usual practice in the New York state courts, the trial judge allowed the attorneys to conduct a lot of the *voir dire*, subject to its direction and control.  In questioning the venire, defense counsel inquired whether scientific evidence like DNA would prevent them from considering other evidence.  One venire person said scientific evidence would be determinative for her.  Defense counsel asked if any other members of the venire felt that way.  As these answers continued to come in, the trial court instructed the jury as follows:

> [I]n this case, there may be DNA evidence and other scientific evidence. That does not end the issue. You must take all the evidence in the case and decide whether the People have proved the case beyond a reasonable doubt. You can't take just one piece of evidence and make your decision based upon that one piece of evidence. And you must be able to keep an open mind during the course of the trial and listen to all the evidence and make your decision at the end.

Another prospective juror then said DNA evidence would be a "big factor", while another said DNA evidence "would have a stronger impact than other evidence."  (It appears these jurors were excused).  Upon presenting the question again, one person answered "no" when asked whether DNA evidence would "overwhelm everything else and said that "all the evidence [would] have an impact."  Defense counsel continued to press his questions about scientific evidence, and the trial court told him, "Wrap it up, please."

After completion of that round of selection, defense counsel told the trial court, "I feel that the court cut me off in regard to" inquiring about DNA.  The court asked him "Tell me how DNA is so crucial in this case," to which defense counsel responded, "I don't think it is at all."  The court explained its reasoning: "It was blown out of proportion to [the point where] we lost jurors who were potentially fair and impartial … because you made it appear DNA was such a big part of this case.  This is not a who-done-it. . . .  [Defendant] admitted that he was there."

The Appellate Division rejected petitioner's argument that the trial court's refusal to allow defense counsel to make further inquiry violated his right to due process of law: "The Supreme Court providently exercised its discretion in limiting defense counsel's jury *voir dire* on the subject of scientific evidence, as such evidence did not play a significant role in the case."  Hubert, 194 A.D.3d at 960 (citations omitted).

The Supreme Court has acknowledged that *voir dire* "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."  Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion).  That is because an inadequate *voir dire* compromises the trial court's "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence."  Id.  Therefore, although the Constitution does not expressly address *voir dire*, it is established that

"part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729 (1992).

However, "[d]espite its importance, the adequacy of *voir dire* is not easily subject to appellate review." Rosales-Lopez, 451 U.S. at 188. That is because the trial court is best able to "reach conclusions as to impartiality and credibility by relying on [its] own evaluations of demeanor evidence and of responses to questions." Id. Trial judges have long been "accorded ample discretion in determining how best to conduct . . . *voir dire*." Id. at 189.

The state court's determination of this issue is neither contrary to nor an unreasonable application of any Supreme Court decision. There is no constitutional rule requiring a trial court to inquire or allow inquiry into the weight that the jury might give to anticipated pieces of evidence, even with regard to scientific evidence – although the trial court, as a practical matter, allowed defense counsel to make that inquiry.

In fact, it is hard to see what more defense counsel needed to ask. The trial court permitted him to question the venire about the weight members might give to scientific evidence; two members said a lot and they did not sit, but the whole panel was provided with the opportunity to speak up on the point and no others indicated that they would give inordinate weight to scientific evidence. And defense counsel's questions were so abstract that they stood to mislead the venire into thinking that DNA evidence would be a smoking gun in the case, when in fact, all it showed was that a piece of clothing near the scene belonged to petitioner – a fact that was essentially undisputed. The trial court's exercise of its discretion to limit the line of inquiry on the ground that it resulted in unnecessary loss of jurors was not excessive, let alone constitutionally excessive, and let alone constitutionally excessive according to the Supreme Court.

### IV.    Excusal of Juror

During lunch break on the first day of trial, one of the jurors, an MTA bus driver, told the trial court that she felt nervous about serving on the jury because she was 99% sure that she had seen petitioner's mother on her bus.  Upon inquiry by the trial court in the presence of counsel, the juror could not recall how many times she had seen petitioner's mother and that she had not seen her for "a while."  The trial court suggested to the juror that she might be mistaken because petitioner's mother lived in New Jersey, but the juror maintained her view that petitioner's mother rode her bus.

Either this belief, or the fact that this was a murder case, or both combined, clearly made the juror apprehensive about serving.  She stated that "I am a parent also.  Like, I wouldn't want somebody that I don't – or feel I know I see on a regular basis to be making a determination about a child of mine."  Notwithstanding that, she said she "guess[ed] [she] could" be fair and impartial.  The trial court asked her if she was afraid and the juror responded, "I do feel a little unsafe because I am in the public by myself.  All types of night."  She elaborated, "I don't know what can happen.  Or who can approach me about this situation. . . .  I don't want to feel like I have to watch over my shoulder."  Although the juror said that this feeling "shouldn't affect how I would determine if he was innocent or guilty," when the trial court asked if she was "generally afraid or that it would affect [her] decision in this case," she responded, "yes."  The trial court made a finding that the juror "could not unequivocally guarantee that this fear, whether baseless or not, would have an effect upon her decision in this case," and that this rendered her "grossly unqualified" as defined by N.Y. C.P.L. § 270.35(1).

On direct appeal, although petitioner's counseled brief gave a passing citation to "U.S. Const., Amends. V, VI, XIV", and asserted that the dismissal of the juror "deprived appellant of

the rights to be tried by a fair and impartial jury and due process," petitioner's argument that the trial court should have made further inquiry was made solely on the basis of N.Y. C.P.L. § 270.35(1). That statute allows dismissal of a sworn juror on a finding that the juror is "grossly unqualified" (among other reasons not applicable here) – and petitioner's argument challenged that finding, relying on New York caselaw that has defined the term. The Appellate Division rejected the argument: "Contrary to the defendant's contentions, the Supreme Court did not deprive him of a fair trial when it discharged a juror, following a probing and tactful inquiry, as grossly unqualified." Hubert, 194 A.D.3d at 960 (citations omitted).

Petitioner's argument in his habeas corpus petition fails for reasons similar to those applicable to his arguments that this Court has previously addressed. A dispute over whether a juror is "grossly unqualified" under N.Y. C.P.L. § 270.35(1) is a matter of New York State law, not federal law, and that is not the standard under the United States Constitution, nor in any Supreme Court decision. "[A]ll the Constitution guarantees is that a defendant be tried by an 'impartial jury.'" Garcia-Lopez v. Fischer, No. 05-cv-10340, 2007 WL 1459253, at *13 (S.D.N.Y. May 17, 2007), as amended (May 18, 2007) (quoting Patton v. Yount, 467 U.S. 1025, 1036 (1964)); see also Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). "Decisions to dismiss jurors are reversed only in cases of 'clear abuse' of the court's discretion." Cabassa v. Filion, No. 03-cv-2920, 2004 WL 1367503, at *7 (S.D.N.Y. June 16, 2004) (quoting United States v. Nelson, 277 F.3d 164, 202 (2d Cir. 2002)); see also United States v. Rosario, 111 F.3d 293, 299 (2d Cir. 1997) ("[A] trial judge is vested with very broad discretion to deal with problems that arise in connection with … a juror's fitness to deliberate.").

The "substitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party." Shepard v. Artuz, No. 99-cv-1912, 2000 WL 423519, at *5 (S.D.N.Y. Apr. 19, 2000) (quoting United States v. Millar, 79 F.3d 338, 342 (2d Cir. 1996)).  Furthermore, "a trial court's finding that a sworn juror was not fit for further service is a factual determination that is entitled to a presumption of correctness unless unsupported by the record." Hughes v. Phillips, 457 F. Supp. 2d 343, 368 (S.D.N.Y. 2006) (citing, *inter alia*, Marshall v. Lonberger, 459 U.S. 422 (1983)). Thus, the Appellate Division's decision was not contrary to, or an unreasonable application of, any Supreme Court decision.

Even without regard to the narrow AEDPA standard of review, "no constitutional claim can arise from the substitution of one juror for another unless the petitioner can demonstrate that the replacement juror was biased or otherwise unfit to serve." Council v. Capra, No. 14-cv-1849, 2015 WL 13746663, at *14 (S.D.N.Y. Sept. 24, 2015), report and recommendation adopted, 2016 WL 165022 (S.D.N.Y. Jan. 14, 2016); Johnson v. Artuz, No. 00-cv-6106, 2006 WL 1144513, at *7 (W.D.N.Y. May 1, 2006) (rejecting a petitioner's claim when he "failed to establish that the substitution resulted in any prejudicial impact on the outcome of his trial"). "Since [petitioner] has in no way established the partiality of the jury that ultimately convicted him, he may not successfully claim deprivation of his sixth amendment or due process rights." Lleshi v. LaClair, No. 13-cv-5874, 2017 WL 1319798, at *12 (S.D.N.Y. Jan. 26, 2017), report and recommendation adopted, 2017 WL 1319927 (S.D.N.Y. Apr. 7, 2017) (quoting United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989)).  Because he relied solely on N.Y. C.P.L. § 270.35(1) in the Appellate Division, petitioner made no argument concerning prejudice, and he has not made one here.

## V.     Harmless Errors

On direct appeal, the Appellate Division identified two errors at trial that it found to be harmless.

First, petitioner contended that the testimony of Sanchez's mother was "sympathy inducing."  The transcript of her direct testimony is less than three pages long.  The prosecutor's questions to her were mostly pedigree about Sanchez – e.g., where he lived, how old he was, his educational background, and his height and weight – plus how his mother learned of his murder and his condition when she arrived at the hospital.  However, on her own volition, Sanchez's mother volunteered additional information in a couple of her answers to the prosecutor's questions which petitioner contends deprived him of a fair trial.  This consisted of her testifying that Sanchez was her only child; that she had taken two college admission letters she received after Sanchez died to his grave to show him that he had been admitted; that she had determined to donate his organs; and that when she arrived in the hospital, she waited for Sanchez to die.[2]  Defense counsel made no objection to any of Mrs. Sanchez's brief testimony.

In addition, petitioner argued to the Appellate Division that the trial court had erred by not redacting a video of petitioner's statement to the police at the precinct.  There were two portions of the tape that petitioner contended were improperly admitted.  First, during the video-recorded interview, petitioner stated: "I ain't never shoot nobody for no reason."  The interrogating officer, according to the Appellate Division, laughingly replied, "You're implying that you['ve] shot more than one person."  Second, petitioner contended that three statements by the interrogating detectives – "I know you're tired of running, too, bro"; "It's been a long, f-------

---

[2] Petitioner challenged two or three other remarks that Mrs. Sanchez interjected, but there is no way to argue that they were prejudicial, e.g., that the housing project in which the Sanchez and his mother lived was not safe.

14

trip, bro"; and "I know you're tired of running, looking over your shoulder" – should have been

redacted.  At trial, defense counsel moved for these redactions and the trial court denied his

request.

The Appellate Division held that the trial court should have stricken Mrs. Sanchez's

expanded answers (as described above), and should have directed the redaction of the video as

defense counsel requested, but that both errors were harmless in light of the "overwhelming

evidence of defendant's guilt and no significant probability that the error[s] contributed to the

defendant's conviction."  Hubert, 194 A.D.3d at 961 (citations omitted).[3]

On habeas corpus review of a state court conviction, a "court must assess the prejudicial

impact of constitutional error in a state-court criminal trial under" the standard set forth in Brecht

v. Abrahamson, 507 U.S. 619 (1993).  Fry v. Pliler, 551 U.S. 112, 121 (2007).  Brecht holds that

"an error is harmless unless it 'had substantial and injurious effect or influence in determining

the jury's verdict.'"  Id. at 116 (2007) (quoting Brecht, 507 U.S. at 631); see also Bentley v.

Scully, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a

'reasonable possibility' that trial error contributed to the verdict.") (quoting Brecht, 507 U.S. at

637)).

"An error was harmless unless it resulted in actual prejudice, meaning that a court has

grave doubt about whether the error . . . substantially and injuriously" affected the verdict.

Orlando v. Nassau Cnty. Dist. Att'y Off., 915 F.3d 113, 127 (2d. Cir. 2019) (quoting Davis v.

---

[3] The Appellate Division also found that petitioner's objection to Mrs. Sanchez was "partially unpreserved."
Hubert, 194 A.D.3d at 961.  It is hard to understand the basis for that statement since trial counsel made no
objections at all.  Because of this ambiguity and the alternative rejection of petitioner's claim as harmless error, this
Court will review the Appellate Division's alternative ruling on harmless error grounds.  See Van Buskirk v.
Baldwin, 265 F.3d 1080, 1083 (9th Cir. 2001) (court may properly deny petition on merits rather than reaching "the
complex questions lurking in the time bar of the AEDPA."); cf. 28 U.S.C. § 2254(b)(2) (application for writ of
habeas corpus may be denied on merits, notwithstanding failure to exhaust state remedies).

Ayala, 576 U.S. 257, 267-68 (2015)) (cleaned up). "When a state court makes a harmless error determination on direct appeal, we owe the 'harmlessness determination itself' deference under [AEDPA]." Id. (quoting Davis, 567 U.S. at 269). "[A] state-court decision is not unreasonable if fairminded jurists could disagree on its correctness." Davis, 567 U.S. at 269 (citation and quotation marks omitted). Therefore, a petitioner must show "that the state court's decision . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 269–70 (citation and quotation marks omitted).

"In assessing an error's likely impact on the jury, 'the Supreme Court has found the following factors to be relevant . . . (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.'" United States v. Lombardozzi, 491 F.3d 61, 76 (2d Cir. 2007) (quoting Zappulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004)). "The strength of the prosecution's case, however, 'is probably the single most critical factor.'" Id. (quoting United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006)).

Applying the Brecht standard, it seems clear that not only could fairminded jurists easily agree with the Appellate Division's decision that these errors were harmless, but that a fairminded jurist would be hard-pressed to find otherwise. This Court does not have a "grave doubt" that the few objectionable interjections in Mrs. Sanchez's brief testimony had any impact on the jury's verdict. And petitioner's statement that he had "never shot nobody for no reason" was an acknowledgment that he had shot Sanchez but was asserting self-defense. It was fully consistent with his defense at trial. It is much too remote to speculate that the jury convicted him

16

because of the possibility of an unknown, unnamed, and unrelated other shooting that they heard nothing about.

Moreover, the factors for harmless error review do not favor petitioner.  The prosecution presented abundant evidence of guilt – two eyewitnesses saw the shooting and both confirmed that Sanchez had no weapon; the forensic evidence showing that Sanchez was shot while turned away from petitioner; numerous aftermath witnesses testified to the absence of a gun near Sanchez's body; and petitioner's own testimony acknowledged that he had shot Sanchez, although he claimed self-defense.  This Court cannot find that the Appellate Division erroneously found admission of this evidence to be harmless.

## VI.    Excessive Sentence

Petitioner appealed to the discretion of the Appellate Division to reduce his aggregate 40-year to life sentence.  At one point, he cited the Eighth Amendment, albeit again only in passing, although that is probably sufficient to raise the issue of whether his sentence constituted cruel and unusual punishment.  The Appellate Division summarily rejected this claim on the merits as one of petitioner's "remaining contentions."  Hubert, 194 A.D.3d at 961 (citations omitted).

The narrow standard of AEDPA review is not needed to reject this claim.  Petitioner's sentence was within the range provided by state law, which is less than constitutionally valid death sentences imposed in other states for this kind of crime.  This was a cold-blooded, sociopathic murder, and petitioner offers no explanation for his conduct.  It is well within constitutional tolerance.  See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.").

## VII.    Ineffective Assistance of Trial Counsel

In his *pro se* brief on direct appeal, petitioner contended that his trial counsel was constitutionally ineffective because: (1) his attorney used his cellphone to photograph a prosecution witness during trial; (2) his attorney made a handful of non-prejudicial mistakes in his court filings;[4] (3) his attorney failed to interview or call "numerous" 911 callers who said they heard multiple gunshots; (4) his attorney called a police witness, Sgt. Guerra, who testified that she did not hear any gunshots; and (5) his attorney failed to object to Mrs. Sanchez's testimony.   The Appellate Division held that petitioner "was not deprived of the effective assistance of counsel."  Hubert, 194 A.D.3d at 961 (citations omitted).  In fact, none of petitioner's claims of constitutional inadequacy survive AEDPA review.

As with many issues on federal habeas corpus review, petitioner faces a double burden.  He must meet not only the narrow standard of review under AEDPA but also the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).  He must first show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms."  Id. at 688.  The Court must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did."  Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (citation omitted).  Second, under the "prejudice" prong, petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  Harrington, 562 U.S. at 112.  Moreover, as the

---

[4] These were mistakes like stating the wrong date in one instance, or sometimes mispronouncing the victim's name, Cesar Sanchez, as "Cesar Chavez."  These are too trivial and non-prejudicial to raise a federal constitution claim.  In fact, the reference to Cesar Chavez instead of Cesar Sanchez could well have been a transcript error.

Second Circuit has noted, "[t]he prejudice inquiry is . . . ineluctably tied to the strength of the prosecution's evidence." Garner v. Lee, 908 F.3d 845, 862 (2d Cir. 2018).

None of petitioner's arguments thread the Strickland-AEDPA needle.  Petitioner has searched the record for mistakes but does not realize that under Strickland, mistakes don't matter if he suffers no prejudice.  Thus, his claim of ineffective assistance for not objecting to the interjections in Mrs. Sanchez's testimony cannot warrant relief, as both the Appellate Division and this Court (above) have held that admission of her statements was harmless error.  (In addition, defense counsel could have reasonably concluded that moving to strike the brief and unexpected testimony would only serve to highlight it.)  Similarly, although it's hard to fathom why trial counsel photographed a prosecution witness, petitioner does not identify any adverse consequences to his case from that transgression.  His point about failure to interview witnesses shows no prejudice because there are no statements from these witnesses in the record as to what they would have said if he had interviewed them.[5]  Even if they would say they heard multiple gunshots, as he speculates they might, there was already abundant evidence from witnesses saying they heard multiple gunshots.  And defense counsel called Sgt. Guerra because he wanted her testimony, in contrast to other witnesses, that she heard no gunshots, thus tending towards reasonable doubt.

Petitioner was not entitled to a perfect trial.  See United States v. Lane, 474 U.S. 438, 445 (1986) ("[T]aking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." (citation omitted)).  But, in fact, a review of the record shows that he had as good a

---

[5] Most claims raising this kind of ineffective assistance are brought under N.Y. C.P.L. § 440.10 so that an appellant can introduce evidence not in the trial record.  Indeed, in responding to petitioner's *pro se* brief to the Appellate Division, the District Attorney suggested that the ineffective assistance claim would be better raised in an expanded record on a collateral attack on the conviction.  Petitioner never did that.

defense as the evidence would allow.  His counsel was highly competent in his arguments and

cross-examinations; in calling six witnesses; in skillfully letting petitioner take the stand without

subjecting him to cross-examination about his problematic past criminal history; and in making a

very focused closing argument.  Petitioner has not nearly met the standard under Strickland,

especially as viewed through the narrow lens of AEDPA.

## VIII.   Limits on Witness Impeachment

One of the detectives who testified at trial, Stephen DiMassa, had three unrelated federal

civil rights lawsuits brought against him arising out of his work as a police officer.  Defense

counsel requested leave from the trial court to cross-examine the detective about those lawsuits.

None of them had resulted in judgments or adverse findings, and the trial court sustained the

prosecutor's objection denying leave to inquire.  It ruled, among other things, that "[i]t wastes a

lot of time with all the lawsuits brought by miscreants in the City of New York who sue every

police officer they can get their hands on."  In his *pro se* brief on direct appeal, petitioner

contended that this ruling deprived him of his 14th Amendment right to due process and his

Sixth Amendment right to confront witnesses.  The Appellate Division summarily rejected this

argument as one of petitioner's "remaining contentions" that were "without merit."  Hubert, 194

A.D.3d at 961 (citations omitted).

Trial courts have wide discretion to impose limits on cross-examination, and habeas relief

is not warranted in the absence of establishing that a violation in this regard deprived petitioner

of a fair trial.  See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also Watson v.

Greene, 640 F.3d 501, 510 (2d Cir. 2011); Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (to

prevail on such a claim, "a petitioner must demonstrate that the state court's evidentiary error

'deprived [him] of a fundamentally fair trial.").  "[T]he test for determining whether [a] ruling

denied the defendant a fair trial is whether [the evidence] would have created 'a reasonable doubt that did not otherwise exist.'" Cusamano v. Donelli, No. 06-cv-2007, 2007 WL 7216166 at *15 (S.D.N.Y. Dec. 19, 2007) (quoting Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. "Combining the standard for restricting cross-examination with the AEDPA standard, in order to grant a habeas petition we would have to conclude not only that the trial court abused its broad discretion by precluding cross-examination but also that the state appellate court could not reasonably have determined that the evidence would have been excludable had the trial court properly applied standard rules of evidence." Alvarez v. Ercole, 763 F.3d 223, 230 (2d Cir. 2014) (cleaned up).

It would have been very difficult, if even possible, for the Appellate Division to have accepted petitioner's argument that prohibiting his cross-examination into three unrelated civil rights actions in which Det. DiMassa was named as a defendant deprived petitioner of his due process or confrontation rights. For one thing, the record does not disclose the subject of those federal civil rights actions. If they were excessive force or illegal search actions, for example, they would almost certainly have nothing to do with Det. DiMassa's credibility. The Appellate Division was therefore not able to assess potential prejudice from the trial court's limitation.

In addition, even if one or more of those three civil rights actions accused Det. DiMassa of some deceptive conduct, they were, as the trial court ruled, only complaints. This Court agrees with the state court, although the state court did not express it in the most elegant way, that because of the confrontational nature of police work, police officers attract civilian

complaints like sugar attracts ants.  It is one thing if a judgment is entered against a police officer

in a case accusing him of deception, or the Civilian Complaint Review Board makes a finding of

deception, or the officer is disciplined internally for deceptive conduct.  But the mere fact that a

plaintiff has brought a federal civil rights action against a police officer has little probative value

as to the officer's credibility.  The state judge was within his discretion in not wanting

petitioner's case to get sidetracked by a mini-trial of three wholly separate and unrelated cases,

especially since petitioner gave him no idea of what was in those federal civil rights actions.

Finally, there is no Supreme Court case holding, or even addressing the issue of, whether

due process or confrontation rights are violated by precluding inquiry into unrelated civil rights

actions against a police officer on cross-examination.  Under AEDPA, the Appellate Division's

decision was therefore neither contrary to nor an unreasonable application of any Supreme Court

authority.

### IX.     Trial Court Misconduct

In his *pro se* brief to the Appellate Division, petitioner accused the trial court of depriving

him of due process by excessively questioning witnesses and interjecting itself during the trial.

Petitioner pointed to three incidents of alleged excess concerning two witnesses.  The Appellate

Division again summarily rejected this argument as part of its denial of petitioner's "remaining

contentions."  Hubert, 194 A.D.3d at 961 (citations omitted).

It was so well-established at common law that trial judges are permitted to examine

witnesses at trial that the practice was expressly codified in Federal Rule of Evidence Rule

614(b): "Examining.  The court may examine a witness regardless of who calls the witness."  It

is therefore clear that "a judge does not deny a defendant due process of law by merely

intervening in a trial to question witnesses."  Gayle v. Scully, 779 F.2d 802, 806 (2d Cir. 1985).

Of course, there are constitutional limits.  But because of the breadth of the trial court's discretion, it is the rare case where a judge's intervention rises to a violation of due process.  See Quercia v. United States, 289 U.S. 466, 468 (1933) (reversing conviction where the judge charged the jury that "I think that every single word that man said, except when he agreed with the Government's testimony, was a lie").

Only judicial intervention that undermines a fundamentally fair trial can amount to due process violation.  Salahuddin v. Strack, No. 97-CV-5789, 1998 WL 812648, at *8 (E.D.N.Y. Aug. 12, 1998).  "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits."  Daye v. Attorney General of State of N.Y., 712 F.2d at 1566, 1572 (2d Cir. 1983).  To prevail on his claim of judicial interference, a petitioner must demonstrate that he did not receive a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing."  Ungar v. Sarafite, 376 U.S. 575, 584 (1964).  "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, . . . or whether 'it appeared clear to the jury that the court believed the accused is guilty.'"  United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996) (quoting United States v. Nazzaro, 472 F.2d 302, 303 (2d Cir. 1973)).

Measured against this standard, the Appellate Division did not rule contrary to or unreasonably apply any Supreme Court authority in rejecting petitioner's argument.  None of the three instances identified by petitioner come close.  The trial court was doing what trial courts are supposed to do – clarifying ambiguous questions, redirecting the witness to answer the question rather than ramble into something else, and moving the trial along so as not to waste

23

time.  That is not partiality or advocacy.  Under any standard of review, petitioner was not denied due process.

**X.      Mishandling of Jury Note**

The final point that petitioner raised in his *pro se* brief to the Appellate Division and in his current habeas corpus petition is that the trial court, in responding to a jury note marked as Note VII, violated N.Y. C.P.L. § 310.30, which sets forth the procedure for responding to jury notes and that this violation rose to the level of a due process violation.  Perhaps petitioner misunderstood the record, but the point is utterly without merit.[6]

The record shows that the jury sent out Note Number VII stating: "Map of the housing with the detective(s) marking."  But when the trial court reviewed the note with the parties, it turned out that the jury already had the exhibit:

> THE COURT: … [Note] Number VII, map of the housing, they want it.  Was that identified?
>
> [THE PROSECUTOR]: It was already brought in, Judge.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: I believe that is 59.
>
> [THE PROSECUTOR]: Yes, Exhibit 59.
>
> THE COURT: Exhibit 59 on the Court's Exhibit Number VII has been given to the jury.  Let's bring in the jury to see the video [another exhibit the parties had discussed].

---

[6] This Court granted the District Attorneys' request to dispense with the filing of exhibits because of their large volume and immateriality to the points of error that petitioner has raised.  In a letter petitioner filed shortly before the issuance of this decision, he requested the exhibits, including all jury notes.  Since there is no dispute about the single exhibit his points of error reference, his request is denied.

When the jury reentered the courtroom to see the video, the trial judge confirmed that the jury already had the map exhibit they had requested:

> THE COURT: Your subsequent note [VII] asks for a map of the housing project. I understand you received that already.
>
> THE JURY:  Yes.

The trial court did nothing wrong either as a matter of state law or federal constitutional law.

## CONCLUSION

The petition is denied and the case is dismissed.  Because petitioner has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

Digitally signed by
Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       February 16, 2023

25